**CV 15          3161**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LENNOX BAILEY,

                        Plaintiff,

      -against-

AIRPORT TERMINAL SERVICES, INC, and
YOULIANA KOUUMDJIEVA, *Individually*,

                       Defendants.
-----------------------------------------------------------------X

**COMPLAINT**

**BLOCK, J.**

**POLLAK, M.J.**

FILED
CLERK
2015 JUN -3 AM 9:15
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

Plaintiff, LENNOX BAILEY, (hereinafter "Plaintiff BAILEY") by and through his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, file this Complaint against Defendant AIRPORT TERMINAL SERVICES (hereinafter "ATS") and YOULIANA KOUUMDJIEVA (hereinafter "KOUUMDJIEVA") upon information and belief as follows:

### NATURE OF THE CASE

1. Plaintiff BAILEY complains pursuant to 42 U.S.C. Section 1981 and the New York City Human Rights Law, New York City Administrative Code § 8-107 *et seq.* seeking to redress the injuries Plaintiff has suffered as a result of being subjected to **discrimination** solely based on his race (Black) and **retaliation** for complaining about race discrimination.

### JURISDICTION

2. Jurisdiction of this action is conferred upon the court as this action involves a Federal Question under 42 U.S.C. § 1981.

3. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331, § 1343, and supplemental jurisdiction pursuant to § 1367.

4. Venue is proper in this district based upon the fact that a substantial part of the events giving rise to the claim occurred within the Eastern District of New York. 28 U.S.C. §

1

1391(b).

## PARTIES

5. Plaintiff BAILEY is a resident of the State of New York, County of Kings.

6. At all times material, Defendant ATS was and is a domestic business corporation, duly incorporated under the laws of the State of Missouri, with its corporate headquarters located at 111 West Port Plaza # 400, St. Louis, MO 63146. Defendant ATS provides services to the aviation community. One of the service offerings is Wingtips Lounge ("Wingtips") located in John F. Kennedy International Airport, Terminal 4, Jamaica, NY 11430.

7. At all times material, Plaintiff BAILEY worked in Wingtips, wherein the majority of the discriminatory conduct against Plaintiff took place.

8. Upon information and belief, at all times material, Defendant KOUUMDJIEVA was and is a resident of the State of New York.

9. At all times material, Defendant KOUUMDJIEVA was an employee of Defendant ATS, holding the position of "Lounge Manager."

10. At all times material, Defendant KOUUMDJIEVA was Plaintiff BAILEY's supervisor and/or held supervisory authority over Plaintiff. Defendant KOUUMDJIEVA had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

11. Plaintiff BAILEY is a Black male.

12. Upon information and belief, Defendant KOUUMDJIEVA is a Caucasian female.

13. At all times material, Defendant KOUUMDJIEVA and Defendant ATS are jointly referred to as "Defendants."

2

## STATEMENT OF MATERIAL FACTS

14. On or about August 4, 2014, Plaintiff BAILEY commenced his employment with Defendant ATS at Wingtips as a "Lounge Attendant," earning $12 per hour.

15. Defendant KOUUMDJIEVA began subjecting Plaintiff BAILEY to discrimination based on his race on the day of his interview.

16. When Plaintiff BAILEY asked Defendant KOUUMDJIEVA for a salary of $13 per hour based on his experience, Defendant turned Plaintiff down. Defendant KOUUMDJIEVA then asked Plaintiff to take a walk with her.

17. **As Plaintiff BAILEY and Defendant KOUUMDJIEVA walked along the windows of Wingtips, Defendant KOUUMDJIEVA directed Plaintiff's attention to the outside view, pointed to the ramp agents, who were Black, and said: "You should be happy you are on the inside – free food and air conditioning."**

18. Plaintiff BAILEY took Defendant KOUUMDJIEVA's statement to mean that in Defendant KOUUMDJIEVA's eyes, Plaintiff should have been grateful that, as a Black man, he was working indoors and he should not have asked for anything more. With that statement, Defendant KOUUMDJIEVA made her discriminatory animus towards Plaintiff BAILEY clear from the onset of Plaintiff's employment, leaving Plaintiff offended and humiliated.

19. In or around September 2014, Defendant KOUUMDJIEVA continued to display her discriminatory intent towards Plaintiff BAILEY when she inexplicably moved Plaintiff to the night shift. When Plaintiff BAILEY asked for an explanation or an increase in pay to move to the night shift, Defendant refused.

20. Subsequently, Defendant KOUUMDJIEVA's hostility towards Plaintiff BAILEY escalated.

21. Defendant began targeting Plaintiff BAILY for not wearing gray pants, which were part of the Wingtips uniform.

22. Defendant KOUUMDJIEVA yelled at Plaintiff BAILEY, in front of Wingtips' VIP guests regarding his uniform, even though Plaintiff had informed Defendant KOUUMDJIEVA that the gray pants Defendants provided for Plaintiff did not fit him.

23. According to Defendants' policy, "[m]anagers are responsible for the distribution of the uniforms, implementation of [the] Policy for their employees and to consider any requests made by employees that are a change to the standard uniform."

24. Meanwhile, Defendant KOUUMDJIEVA never reprimanded Pavel Olofinsky, Plaintiff's Caucasian similarly situated co-worker, who wore baseball caps and sneakers to work. Mr. Olofinsky's attire was in direct violation of Defendants' policy, which stated that "for areas where a uniform is not a requirement, it is important that employees dress in business attire."

25. Less than two months after the start of his employment with Defendants, on or about September 30, 2014, Plaintiff BAILEY was assigned to the night shift, without a proper briefing of his work duties and assignments. Plaintiff learned that the new assignment entailed wiping down fifty-two (52) tables, adjusting over a hundred (100) lounge chairs and emptying seven (7) garbage bins, in addition to his regular duties.

26. On or about October 16, 2014, Plaintiff received a write-up from Defendant KOUUMDJIEVA. David Flax, Plaintiff's co-worker, informed Defendant KOUUMDJIEVA that the lounge was dirty and soup had been left on October 1, 2014, the day Plaintiff began working on the night shift.

27. The following night, on or about October 2, 2014, Plaintiff BAILEY asked Mr. Olofinsky, whether he also had to wipe tables and take out garbage. Mr. Olofinsky told Plaintiff

BAILEY that if Plaintiff wanted to keep his job, he should just do what he was asked and be quiet, as he mocked Plaintiff.

28. **When Plaintiff BAILEY asked Mr. Olofinsky why he was not obligated to perform the same tasks, Mr. Olofinsky said: "I'm senior and not Black" continuing to laugh at Plaintiff.**

29. Subsequently, in or around November of 2014, Defendant KOUUMDJIEVA promoted Plaintiff's Caucasian co-worker, Mr. Flax, to supervisor after posting the position in the front desk of Wingtips two weeks prior.

30. Before promoting Mr. Flax, Defendant KOUUMDJIEVA trained him to handle liquor inventory.

31. **When Plaintiff BAILEY asked Defendant KOUUMDJIEVA whether anyone else would be trained for liquor inventory, and to learn skills needed for the supervisor position, Defendant KOUUMDJIEVA told Plaintiff BAILEY, "you need not apply," referring to the supervisor position.**

32. Knowing that Defendant KOUUMDJIEVA had already promised the promotion to Mr. Flax, as he boasted about it before Defendant KOUUMDJIEVA announced the decision, Plaintiff BAILEY no longer pursued it.

33. Then, in or around December 2014, Plaintiff BAILEY asked Defendant KOUUMDJIEVA to work more hours. However, Defendant KOUUMDJIEVA denied Plaintiff's request. Mr. Olofinsky, on the other hand, worked up to fifty-six (56) hours, with Defendant KOUUMDJIEVA's approval. As such, Plaintiff BAILEY was denied the additional income and overtime that was offered to his Caucasian similarly situated co-workers.

34. **Meanwhile, since Plaintiff BAILEY started working with Mr. Olofinsky on the night shift, Plaintiff was subjected to severe and pervasive harassment based on his race, as Mr. Olofinsky made derogatory comments regarding Plaintiff's race on a continuous basis.**

35. **By way of example, Mr. Olofinsky would say to Plaintiff BAILEY, "you should be happy this is not a plantation."**

36. **Defendant KOUUMDJIEVA was aware of Mr. Olofinsky's actions towards Plaintiff. However, whenever Plaintiff tried to approach her to complain about Mr. Olofinsky's racist conduct, she dismissed him.**

37. Then, on or about January 15, 2015, Plaintiff BAILEY visited Dr. Gerald Valme, due to a stomach virus. The doctor provided Plaintiff with a note for Defendants stating that Plaintiff BAILEY was under his "care from 1/15/15 to 1/20/15 and [was] able to return to work on 01/21/15 with no limitations."

38. Per doctor's orders, Plaintiff BAILEY did not go to work on January 16, 2015. Plaintiff faxed the doctor's note to Defendants on January 15, 2015, two (2) days prior to his scheduled shift. Defendants' policy only required two hours' notice.

39. However, although Plaintiff BAILEY notified Defendants that he was going to miss work on January 16th and used a day from his three (3) accrued sick days, Defendant KOUUMDJIEVA wrote Plaintiff BAILEY up for missing work.

40. Once again, Plaintiff BAILEY felt that he was being treated differently by Defendant KOUUMDJIEVA solely on the basis of his race.

41. Thereafter, on or about January 26, 2015, there was a snow storm. Defendant KOUUMDJIEVA called Plaintiff BAILEY and left him a voice message notifying Plaintiff

that he did not have to come to work the following day and that Defendant KOUUMDJIEVA would call Plaintiff back if anything changed.

42. Per Defendant KOUUMDJIEVA's instructions, Plaintiff BAILEY did not go to work on January 27, 2015.

43. However, the next day, on January 28, 2015, Plaintiff BAILEY was written-up by Defendant KOUUMDJIEVA for "not showing up" to work the previous day and received eight (8) points, which under Defendants' policy is the maximum amount of disciplinary points given for an attendance issue.

44. There were other employees who did not go to work during the snowstorm, but, upon information and belief, they were not written-up. **Furthermore, Plaintiff's co-worker, Vaneta Sugrim, who was also non-Caucasian, was recorded in the write-up as a witness. However, there was no signature next to her printed name and upon information and belief, Ms. Sugrim did not know that she was used as a witness.**

45. Plaintiff BAILEY confronted Defendant KOUUMDJIEVA telling her that the write-up was unfair and that the witness, Ms. Sugrim, did not even know that her name was on the write-up. Plaintiff BAILEY refused to sign the write-up, making it clear to Defendant KOUUMDJIEVA that he was being written-up for something that was not his fault.

46. **Furthermore, Plaintiff told Defendant KOUUMDJIEVA that he felt he was being singled out as a Black employee, since other employees missed work frequently and were not reprimanded.**

47. The more Plaintiff BAILEY complained regarding his discriminatory treatment to Defendant KOUUMDJIEVA, the more he was subjected to retaliatory acts.

7

48. On or about March 6, 2015, Plaintiff BAILEY reported an incident regarding an intoxicated passenger in the lounge to Defendant KOUUMDJIEVA. Shortly after receiving Plaintiff's e-mail, Defendant KOUUMDJIEVA e-mailed the Wingtips team regarding the procedure to follow with respect to intoxicated passengers.

49. Although Plaintiff BAILEY reported the incident to Defendant KOUUMDJIEVA, Mr. Flax, Plaintiff's other supervisor and Defendant KOUUMDJIEVA's right-hand man, reprimanded Plaintiff BAILEY regarding monitoring customers in the lounge. On the other hand, Defendants took no adverse action against Mr. Olofinsky, who was rude to the intoxicated passenger and called him a "drunk bastard."

50. Then, Plaintiff BAILEY asked Defendant KOUUMDJIEVA once again on or about March 6, 2015 to work more hours, as Randall, another Lounge Attendant was leaving Wingtips. However, Defendant KOUUMDJIEVA denied Plaintiff's request again, as she firmly responded that she did not have a "full time position available at [the] time."

51. Subsequently, on or about March 7, 2015, Plaintiff BAILEY wrote an e-mail to Ingrid Braeuninger, Defendant KOUUMDJIEVA's supervisor, copying Defendant KOUUMDJIEVA, stating that he felt that he was "being treated unfairly" and was not granted full-time hours, although another employee, who had worked for Defendants for fewer than three (3) months was granted full time hours. However, Ms. Braueninger never responded to Plaintiff's complaint.

52. On or about March 27, 2015, only one day after Plaintiff BAILEY sent the aforementioned e-mail to Ms. Braeuninger and Defendant KOUUMDJIEVA, complaining of disparate treatment, Defendant KOUUMDJIEVA e-mailed Plaintiff BAILEY demanding an

explanation regarding certain passengers who were not processed in the Wingtips' system on or about March 21, 2015.

53. Defendant KOUUMDJIEV's e-mail came in response to Plaintiff's request for bereavement time for his aunt, who died in Trinidad. Defendant KOUUMDJIEVA completely ignored Plaintiff's request and, instead, found a new way to target Plaintiff with her hostile treatment against him.

54. The next day, on or about March 28, 2015, Plaintiff responded to Defendant KOUUMDJIEVA, explaining the reason for not processing the passengers. However, Defendant KOUUMDJIEVA asked for more information from Plaintiff, which Plaintiff submitted to her.

55. Plaintiff BAILEY felt that Defendant KOUUMDJIEVA was constantly treating him differently based on his race.

56. Meanwhile, Plaintiff was continuously subjected to derogatory racial comments by his co-worker, Mr. Olofinsky.

57. **By way of example, on or about April 8, 2015, after seeing a news report regarding a white cop shooting an unarmed Black man on the Wingtips' TV, Mr. Olofinsky said to Plaintiff BAILEY: "That's what you gotta do, kill them Niggers Out." Immediately thereafter, a Black basketball player appeared on the screen and Mr. Olofinsky added while laughing, "Damn, a lot of Niggers left."**

58. **Then, on or about April 11, 2015, Mr. Olofinsky followed Plaintiff BAILEY to the restroom and told Plaintiff that Mr. Olofinsky was being promoted, adding: "I have to crack my last racist joke." As Plaintiff BAILEY walked away from him, Mr. Olofinsky said: "Nigger, I'm talking to you!"**

59. Two days later, on or about April 13, 2015, Defendant KOUUMDJIEVA announced that Mr. Olofinsky was promoted to "Lounge Lead Agent." **Defendant KOUUMDJIEVA promoted Mr. Olofinsky despite the fact that he broke a myriad of Defendants' company policy rules: from actively discriminating against Plaintiff BAILEY based on his race, to violating the dress code and sleeping on the job.**

60. Then, on or about April 15, 2015, Defendant KOUUMDJIEVA and Mr. Flax asked to speak with Plaintiff BAILEY upon his arrival at work, and presented him with a write-up for not processing the two lounge passengers on March 21, 2015. Plaintiff refused to sign the write-up and asked whether he could have a witness present. However, Defendant KOUUMDJIEVA and David Flax refused.

61. **Feeling that he was once again being treated unlawfully solely on the basis of his race, Plaintiff BAILEY told Defendant KOUUMDJIEVA and Mr. Flax that what was happening to him was "discrimination," "racist" and "unfair."**

62. Plaintiff BAILEY was certainly being treated differently by Defendants based on his race, as Defendants did not reprimand Mr. Olofinsky, Defendants' Caucasian employee, when he made mistakes and passengers complained about him. In fact, his unlawful and unprofessional behavior was rewarded with a promotion.

63. Plaintiff BAILEY felt humiliated and hurt by the discrimination he endured at the hands of Defendants. Plaintiff told Mr. Flax and Defendant KOUUMDJIEVA that he would only sign the write-up if there was a witness present.

64. Once Plaintiff BAILEY walked back to the front desk, away from the seating and dining areas, he said to his co-workers that his write-up was not fair. **As Defendant KOUUMDJIEVA and David Flax approached the front desk, Plaintiff BAILEY**

**asked them to speak to him in front of his co-workers and again stated that he felt that their actions were "racist" and constituted "discrimination."**

65. At that point, Defendant KOUUMDJIEVA and Mr. Flax turned red and Defendant KOUUMDJIEVA asked Plaintiff's co-workers to call 3700, which was the code for JFK police.

66. Once the police officers approached and asked Plaintiff BAILEY to step outside of the lounge, **one of the police officers informed Plaintiff that Defendant KOUUMDJIEVA was suspending him for safety reasons, although Plaintiff never showed signs of a threat. Furthermore, Defendant KOUUMDJIEVA lied to the police officers, stating that Plaintiff BAILEY said that he would only be taken out in cuffs.**

67. **Subsequently, Plaintiff BAILEY was written-up, yet again, in retaliation for complaining against racial discrimination under the pretext of insubordination.**

68. Plaintiff BAILEY felt extremely humiliated and degraded as he was escorted by two police officers back to the break room and out of Wingtips, in front of his peers, like an outlaw.

69. **On or about April 16, 2015, Plaintiff's co-worker, Ms. Monique Martin, who is also Black, wrote to Jeff Luetkenhaus, Manager of Employee Relations, corroborating Plaintiff's recount of the April 15, 2015 events. Ms. Martin stated that Plaintiff said to Defendant KOUUMDJIEVA and David Flax: "this is racist, you are racist, this is discrimination" and added: "Youlianna in shock turned and walked out of the lounge. David stepped in and asked Lennox to step out side but he refused. They then called security and when Lennox was asked to leave by the officers he didn't refuse."**

70. Furthermore, Ms. Martin painted the broader picture of Defendants' favorable treatment of Caucasians to Mr. Luetkenhaus.

11

71. **Ms. Martin then added: "From what has been told to me this is not the first time someone of color has been looked over for a position and the position was given to someone Caucasian."**

72. **Subsequently, or about April 17, 2015, Plaintiff BAILEY wrote an e-mail to Mr. Luetkenhaus, complaining in detail regarding the discriminatory treatment to which he was subjected at the hands of Defendants, solely on the basis of his race.**

73. That same day, Ms. Sugrim also wrote an e-mail to Mr. Luetkenhaus, where, amongst other issues, she communicated to Mr. Luetkenhaus that although she had been assigned upper level duties, "Pavel someone who does little to no work on the overnights and sleeps all night for his shifts [got] a promotion as lead" instead of Ms. Sugrim, who was Black.

74. With respect to the events of April 15th involving Plaintiff BAILEY, Ms. Sugrim stated: **"As per lennox incident it basically led up too his frustrations with being mistreated by youliana. she would write him up for mistakes constantly and the same mistakes other agents would make is usually just swept under the rug."**

75. **Thereafter, on April 20, 2015, after receiving Plaintiff BAILEY's detailed complaint of discrimination, as well as the aforementioned e-mails by Ms. Sugrim and Ms. Martin, Defendants chose to terminate Plaintiff, in retaliation for his complaints of racial discrimination, instead of conducting a proper investigation.**

76. Plaintiff BAILEY has been unlawfully discriminated, humiliated, degraded, and victimized due to the above discriminatory conduct by Defendants.

77. Plaintiff BAILEY was subjected to discrimination during the course of his employment with Defendants because of his race.

78. Plaintiff BAILEY was subjected to retaliation by Defendants because he engaged in a protected activity by opposing and objecting to the discriminatory conduct he endured to his superiors.

79. **Defendants' actions and conduct were intentional and intended to harm Plaintiff BAILEY.**

80. As a result of the Defendants' discriminatory and intolerable treatment by Defendants, Plaintiff BAILEY had suffered emotional distress and monetary loss.

81. As a result of the acts and conduct complained of herein, Plaintiff BAILEY has suffered and will continue to suffer the loss of income, promotion, the loss of a salary, bonuses, benefits and other compensation which stem directly from his employment with Defendants. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced emotional and physical distress.

82. As a result of the above, Plaintiff BAILEY has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

83. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff BAILEY demands Punitive Damages as against all the Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER 42 U.S.C. § 1981
## (Not Against Individual Defendant)

84. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

85. 42 USC § 1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981

86. Defendant ATS violated the above section as set forth herein.

## AS A SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER 42 U.S.C. § 1981
## (Not Against Individual Defendant)

87. Plaintiff BAILEY repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

88. By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under 42 U.S.C. § 1981.

89. Defendant ATS acted with malice and/or reckless indifference to Plaintiff' statutorily protected rights.

90. As a result of Defendant ATS' discriminatory acts, Plaintiff BAILEY has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

91. Plaintiff BAILEY repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

92. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

93. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, § 8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of his race and/or national origin.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

94. Plaintiff BAILEY repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

95. The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

96. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(7) by discriminating against Plaintiff because of Plaintiff' opposition to the unlawful employment practices of Plaintiff's employer.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE (As Against Individual Defendant Only)

97. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

98. The New York City Administrative Code Title 8, § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

99. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (Not Against Individual Defendant)

100. Plaintiff BAILEY repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

101. New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

   a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

   b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

   (1) the employee or agent exercised managerial or supervisory responsibility; or

   (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

   (3) the employer should have known of the employee's or agent's discriminatory

16

conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

102. Defendant violated the above section as set forth herein.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. Section 1981 and the New York City Administrative Code § 8-107, *et. seq.*, and that Defendants discriminated against Plaintiff BAILEY because of his race and retaliated against him for complaining of such discrimination;

B. Awarding damages to Plaintiff BAILEY resulting from Defendants' unlawful employment practices and conduct, and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff BAILEY compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount in excess of the jurisdiction of all lower courts;

D. Awarding Plaintiff BAILEY punitive damages;

E. Awarding Plaintiff BAILEY attorney's fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff BAILEY such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants unlawful employment practices.

**WHEREFORE**, Plaintiff BAILEY demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages,

attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: New York, New York
       June 1, 2015

                                **PHILLIPS & ASSOCIATES,**
                                **ATTORNEYS AT LAW, PLLC**

By: _____
                                Nicole Welch, Esq.
                                Dorina Cela, Esq.
                                *Attorneys for Plaintiff*
                                45 Broadway, Suite 620
                                New York, New York 10006
                                (212) 248-7431
                                nwelch@tpglaws.com
                                dcela@tpglaws.com